## Case No. 6,660.

HOME INS. CO. v. STANCHFIELD et al.

[2 Abb. U. S. 1; 1 Dill. 424; 4 Am. Law T.
Rep. U. S. Cts. 171; 3 Chi. Leg. News,
97; 5 Am. Law Rev. 564.] [1]

Circuit Court, D. Minnesota. Oct., 1870.

INSURANCE—INJUNCTION—DISCOVERY.

1. A circuit court ought not to entertain a bill in equity filed by an insurance company, after a loss has occurred under a policy issued by them, to procure a decree canceling the policy and enjoining the insured from bringing any action upon it, where the bill is founded upon charges of fraud in obtaining the policy, which, if true, might be set up in defence of an action at law upon it. So *held*, where the policy contained a clause limiting the time for suing upon it to twelve months from the date of the loss; so that there was no danger of injury to the complainant through any unreasonable delay to sue.

[Cited in Bowden v. Santos, Case No. 1,716; Morse Arms Manuf'g Co. v. Winchester Repeating Arms Co., 33 Fed. 184; Hartford Fire Ins. Co. v. Bonner Mercantile Co., 44 Fed. 156; Walker v. Brown, 58 Fed. 26.]

2. Query, whether a circuit court within a state whose laws allow parties to examine each other upon a given cause of action or defense, ought to entertain a bill of discovery, merely in aid of such cause of action or defense?

[In equity. Bill by the Home Insurance Company of New York against Stanchfield and Newman.]

[1][The bill states, in substance, that the complainant is a foreign insurance corporation, and that the respondents are citizens of the state of Minnesota; that on the 15th day of December, 1858, it issued its policy of insurance to the respondent, Stanchfield, the loss, if any, to be paid to the respondent, Newman, whereby the complainant, in consideration of the sum of $45 premium, agreed to insure the said Stanchfield for one year, against loss by fire, to the amount of $3,000, on his three-story stone building in the city of St. Anthony, Minnesota. The bill alleges that when Stanchfield applied for insurance on the building, he made to the agent of the complainant the following representations: (1) That he was the owner of the building and ground on which it was situate. (2) That the property was not incumbered, except by a mortgage executed to a party outside of the state, which mortgage was without consideration and invalid, having been given to protect the property from his creditors. (3) That the building was worth $6,000, and that he had been offered that for it by a Mr. Sidle, a short time before. The bill states that these representations were false; that Stanchfield was not the owner, but does not allege who was; that the building was not worth $6,000, but only $1,500, and that Mr.

1 [Reported by Benjamin Vaughan Abbott, Esq., and by Hon. John F. Dillon, Circuit Judge, and here compiled and reprinted by permission. The syllabus and opinion are from 2 Abb. U. S. 1, and the statement is from 1 Dill. 424. 5 Am. Law Rev. 564, contains only a partial report.]

Sidle never made any offer to purchase it. The bill particularly states that in addition to the mortgage which was admitted to exist, there was a mortgage to Pinney & Dorman for $2,727, a mechanic's lien in favor of Alden, Cutter & Hall for $1,365, and a mortgage to Corwith & Co. for $18,000. It is alleged that the complainant was ignorant of the existence of these incumbrances; that it relied on the representations so made; that the said Stanchfield knew they were untrue, and made them fraudulently to deceive the complainant and to procure the policy. It is also averred that the building insured was destroyed by fire on the 19th day of November, 1869, and that the falsity of the representations made by Stanchfield to procure the policy, and his fraud in that respect, were not discovered until two weeks before this bill was filed, which was on the 23d day of March, 1870. The bill also states that the policy has been demanded back of the respondent, and the premium money tendered to him, but that he refuses to accept the money or give up the policy; but on the contrary, threatens to institute a suit thereon. The bill asks for a temporary injunction to restrain the defendants from commencing an action, in any court upon the policy, and that on the final hearing the defendants may be decreed to deliver up to the complainant the policy to be cancelled, and that it be declared null and void, and for general relief. On the bill, and before answer, a temporary injunction was allowed by one of the judges of this court. The answer has since been filed, admitting the issuing of the policy, the loss, the intention to sue on the policy, but denying generally and specially the alleged fraud, or fraudulent representations or intent. The answer states that the defendant Stanchfield was and is the owner of the building and the ground. It admits that the defendant Newman (a son-in-law of Stanchfield), by agreement between the parties, paid taxes for the purpose of preventing the property from being sold to strangers, and for the benefit of Stanchfield, who was to reimburse him; that in 1865 (as the defendant Stanchfield has learned since the fire), Newman, in paying taxes, took a certificate of sale, but the answer alleges that he never made any claim by virtue of the said tax sale, and that prior to the fire, namely, in February, 1869, the amount which Newman had paid for taxes was repaid to him by Stanchfield. The answer admits that Stanchfield, when he applied for insurance, did state that he owned the property, and denies that such is not the fact, but avers, as above stated, that he did and does own it. As to the value of the building, the answer admits that Stanchfield stated to complainant's agent that it was worth $6,000; and it alleges that it cost $18,000 and was worth $9,000, and that the agent of the company made a personal examination of the building to learn its value, and that he relied on that,

and not on any representation or statement of Stanchfield. The answer admits that Stanchfield stated to the complainant's agent, not that Sidle had made a formal offer of $6,000 for the property, but that he had said he would pay that sum therefor. Respecting the incumbrances, the answer alleges that Stanchfield stated that there was a mortgage to Corwith & Co., of Galena, Ill., for $18,000, which had been voluntarily given in 1858, to secure future or contemplated advances, and also to keep off some unjust claims; but he denies that he stated that it was invalid or without consideration, and he thinks he is now owing nothing upon it. It denies representing that this was the only mortgage or incumbrance, but admits that Stanchfield represented, that aside from certain judgment liens, it was the only incumbrance. It alleges that the mortgage to Pinney & Dorman for $2,727, mentioned in the bill, has long been paid, and denies the existence of the alleged mechanic's lien in favor of Alden, Cutter & Hall. A copy of the policy is filed with the answer. On the coming in of the answer, the defendants moved, at the June term, 1870, upon the bill and answer, before Mr. Justice Miller, and Dillon, Circuit Judge, for a dissolution of the temporary injunction, upon two grounds: (1) The answer denies the material averments of the bill; (2) the bill contains no sufficient equities to give the court jurisdiction in chancery, or to warrant the injunction. It is this motion which is now before the court to be decided.][2]

Atwater & Flandrau, for the motion.
H. H. Finley and C. K. Davis, contra.

Before MILLER, Circuit Justice, and DILLON, Circuit Judge.

DILLON, Circuit Judge. This is a bill in equity by the Home Insurance Company of New York, to cancel a policy of insurance against fire, issued by it to the respondent, Stanchfield, and for an injunction to restrain him from commencing action thereon. The policy was in the usual form of such instruments, and by its terms was to continue in force for one year, or until December 15, 1869. In November, 1869, the building covered by the policy was consumed by fire, and in the March succeeding, the present bill was exhibited. The nature of the bill appears above, and it is, in substance, one to have the policy declared void because it was procured by the assured by means of false and fraudulent representations. A temporary injunction to restrain the respondents from commencing any action on the policy was allowed before answer. On the coming in of the answer, which denies the alleged fraud and fraudulent representations, a motion is made to have the order for the injunction vacated; and it is this motion which was argued by counsel, and which the court is now to decide. But the solicitors for both parties desired the questions arising on the bill and answer to be disposed of on their merits, and to have the court determine whether bills like the present one are maintainable in equity, when the fraud alleged as a ground for the cancellation of the policy is available to the company as a defence to an action on the policy, and constitutes, if proved, a complete defence thereto.

Under the full denials in the answer of the fraud charged in the bill, there would be little hesitation in holding that the injunction ought to be dissolved; but though dissolved, the bill would yet be pending, and the question as to the right to maintain such a bill would still remain to be decided.

The complainant's solicitor maintains that the bill is sustainable upon two grounds: (1) Because a discovery is sought, and relief consequent upon the discovery. (2) Because courts of equity have jurisdiction concurrent with courts of law in matters of fraud, and will, in all cases, set aside agreements obtained by means of false and fraudulent representations. Of these grounds in their order; and first as to the discovery. This is not a bill for discovery in aid of a suit or defence at law, and it is only a bill of discovery in the same general sense that every bill is such which seeks an answer from the defendant under oath. It is simply a bill calling for an answer under oath, and praying that a policy of insurance be set aside because it was procured by fraud. Bills of discovery had their origin at a time when at law a party was not entitled to and could not obtain the evidence of his adversary. By the legislation of Minnesota (St. 1866, 520), and by that of congress—Act July 6, 1862 (12 Stat. 588); Act July 2, 1864 (13 Stat. 351)—parties to suits at law, in equity and admiralty, are not only permitted to testify in their own behalf, but compellable to testify at the instance of the adverse party. Berry v. Fletcher [Case No. 1,356]; Rison v. Cribbs [Id. 11,860]; United States v. Hawthorne [Id. 15,332]. The effect of this legislation is to remove the grounds or reasons which originally existed for bills of discovery, and it may admit of doubt whether a bill merely to obtain discovery in aid of another action or defence ought longer to be sustained; but this is a point not now necessary to be determined. If the present bill be treated as one for discovery and relief, and as one where the necessity of obtaining a discovery is the ground of equity jurisdiction, the discovery sought has failed, for the answer denies all the essential averments of the bill charging fraud, and where this is the result the bill must be dismissed.

Speaking of such a case, Mr. Justice STORY says: "If the discovery is totally denied by the answer, the bill must be dismissed, and the relief denied, although there might be other evidence sufficient to establish a title to relief, for the subject matter is, under such circumstances, exclusively

remediable at law." Story, Eq. Jur. § 691; Id. §§ 74, 690. As to the first ground of equitable jurisdiction, viz: the necessity for a discovery from the defendant, it fails because the complainant has failed to obtain the discovery he sought. Brown v. Swann, 10 Pet. [35 U. S.] 497; Russell v. Clark, 7 Cranch [11 U. S.] 69, 89; Young v. Colt [Case No. 18,155].

We are thus brought to the main question argued by the counsel, whether equity will entertain a bill to cancel a fire policy, filed after a loss has happened, where the foundation for the relief sought is the fraudulent representations of the assured in procuring the policy, with respect to the property, its ownership, value, the state of the incumbrances, &c., when such fraudulent representations are a good defence at law to an action on the policy, and available as such to the company.

If such a bill will lie, the present suit having been brought, and properly brought, the assured would not be allowed afterwards to sue at law on the policy, pending the equity suit to cancel it, and hence an injunction to restrain the commencement of such an action, if threatened, would be proper. But, if on the other hand equity will not entertain such a bill as the present, of course the injunction should not have been course, and ought to be dissolved.

The injunction feature of the present suit is thus dependent upon the principal inquiry before us, and we shall give no separate consideration to it. The policy to which this suit relates contains two provisions, usual in such instruments, to which reference may be made, as bearing upon the question to be decided. One is that the loss, if any happens, is not payable immediately, but only after the preliminary proofs required by the policy are furnished. The other is "that no suit or action of any kind against said company for the recovery of any claim upon, under, or by virtue of this policy, shall be sustainable in any court of law or chancery, unless such suit or action shall be commenced within the term of twelve months next after any loss or damage shall occur, etc."

It may be here remarked that it is settled law that a condition in a policy requiring any action thereon to be brought within a limited and specified time is valid and binding. Ripley v. Aetna Ins. Co., 30 N. Y. 136; Roach v. New York Ins. Co., Id. 546; Carter v. Ins. Co., 12 Iowa, 287; Gray v. Hartford Ins. Co. [Case No. 3,375].

It is our opinion that the present bill sets forth no sufficient grounds for equitable interference, and we now proceed to state the reasons on which this opinion rests. No principle is more familiar than the one that where the law affords a full, complete, and adequate remedy, equity will not interfere. "Chancery," says Lord Bacon, "is ordained to supply the law, not to subvert the law."

4 Bac. Works, 488. In other words, the parties must litigate in the law courts, unless there are good or legal reasons for invoking the aid of equity. This principle, or rule must have full effect given to it in the courts of the Union, for it is recognized by the constitution, and by the judiciary act.

The constitution declares that "in suits at common law * * * the right of trial by jury shall be preserved" (Amends. art. 7); and the judiciary act in terms, provides that "suits in equity shall not be sustained in either of the courts of the United States in any case where plain, adequate, and complete remedy can be had at law" (1 Stat. 82, § 16).

In the case before us, no reason is set forth in the bill showing that the insurance company needs the aid of a court of equity to relieve itself of liability on the policy. Before the bill was filed, the loss had happened. By the terms of the policy, the assured was bound to sue within a year, or be forever barred. The bill alleges that he is about to bring an action on the policy. If the facts averred in the bill are true, they constitute a complete defence to such an action, and nothing is set forth showing that any obstacles stand in the way of making this defence at law. If no loss had happened, and especially, if the policy had many years to run, such as life policies, there would seem to be a necessity to sustain a resort to equity to cancel the contract, where it had been procured by fraud. But such is not the case now before the court. There are, however, other and perhaps more satisfactory grounds for not entertaining the present bill. The bill is one to have a contract, made between the parties, decreed to be delivered up to be cancelled. This cannot be done without wholly taking the matter out of the law courts, and cutting off all actions in those courts. If this bill is not sustained, the parties are simply left to their legal rights and remedies. If no hardship, no injustice, will result, and no reason appears for not leaving the parties to their rights and remedies at law, equity will leave them there. Now, it is well settled, to use the language of Mr. Justice Story, that an application to equity, to have "instruments cancelled or delivered up, is not, strictly speaking, a matter of right, * * * but of sound discretion, to be exercised by the court, either in granting or refusing the relief prayed, according to its own notion of what is reasonable and proper under all the circumstances of the particular case." 2 Story, Eq. Jur. § 693.

Chancellor Kent, in holding that a court of equity had full power to order instruments to be delivered up, whether void or not, at law, and even if void on their face, after reviewing some of the leading English cases, says: "But, while I assert the authority of the court to sustain such bills, I am not to be understood as encouraging applications

where the fitness of the exercise of the power of the court is not pretty strongly displayed. Perhaps," he adds, "the cases may all be reconciled on the general principle, that the exercise of this power is to be regulated by sound discretion, as the circumstances of the individual case may dictate; and that the resort to equity, to be sustained, must be expedient, either because the instrument is liable to abuse from its negotiable nature, or because the defence, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case, and rendering a resort here highly proper, and clear of all suspicion of any design to promote expense and litigation." Hamilton v. Cummings, 1 Johns. Ch. 517, 523, referred to by Marshall, C. J., in Peirsoll v. Elliott, 6 Pet. [31 U. S.] 95.

Applying these principles to the present case, we need not deny that equity has jurisdiction, by reason of the fraud alleged, to entertain the suit; but are of the opinion that it is inexpedient to exercise it under the case made by the bill. To leave the parties at law seems a more reasonable and proper exercise of the discretion which the court has in bills to cancel contracts, than to retain the bill and exercise the authority asked. Because: (1) The company has a full, plain, and perfect defence to the policy at law, and no reason is shown why a resort to equity is either necessary, expedient, or proper. (2) Action at law on the policy must (as we have seen) be brought in a short, limited time after the loss. In the present case, only about seven months remained to the assured, and the bill alleges that he was about to bring suit; the purpose of the present bill is, therefore, manifest, viz.: to force the assured to litigate in equity instead of at law, thereby depriving the party of the right to a trial by jury. (3) If the bill be entertained because the insurance company has the right to resort to equity, then all similar bills must likewise be entertained in equity, and this gives the companies the advantage of a choice of forum. If the company prefers to litigate in equity, it will file its bill before the preliminary proofs are furnished, and thus compel the assured to settle the controversy in that court. If, on the other hand, the company prefers to litigate at law, it will simply omit to file a bill, and await the action of the assured, who, unless there is some special ground for going into equity, must be content with his legal remedies. (4) The effect of sustaining the right to resort to equity, would be to transfer the great bulk of all litigation arising out of losses under policies, from the courts of law into the courts of equity. The business of insurance is now almost wholly carried on by companies of large capital, and these are, in most instances, foreign corporations. From the supposed sympathy of jurors in favor of the assured as against the insurance company, and from the supposed even-handed impartiality of the judge, it is not difficult to see that companies, having the choice of courts, would prefer the equitable to the legal forum, in almost all cases. And the court must say that it is the result of its experience, in the trial of insurance cases, that the fears which the companies entertain as to the sympathy of the jurors in favor of the assured, have, by far too much foundation. But the remedy lies in the more liberal exercise by the common law courts of the power to grant new trials where verdicts are clearly wrong, and not in an extension of equity cognizance over controversies and issues in their nature essentially legal.

Having discussed the case on principle, it is due to its intrinsic importance, as well as to the importance which counsel attach to it, and the care with which they have prepared their arguments, that we should also examine it in the light of authority. All the cases referred to by counsel have been examined. Many of them are meagerly reported, and very unsatisfactory, and, some of them, conflicting. The result of the examination is the belief that the weight of modern judicial opinion is in favor of, rather than against the views above expressed.

It may be admitted that the early English cases below mentioned, would favor the retention of the present bill, for equity seems then to have exercised a very free jurisdiction, and to have cancelled policies with a liberal hand, even where there was a complete remedy or defence at law. Referring to this, Sir James Mansfield, C. J., in a case before him, said: "Courts of equity formerly exercised an odd jurisdiction on this subject" (Cousins v. Nantes, 3 Taunt. 517), "alluding, perhaps," says Mr. Phillips, who quotes the passage, "to cases of interference by equity courts, where there was an adequate remedy at law" (2 Phil. Ins. pl. 1933).

But, at the present day, insurance contracts are regarded by the courts as standing upon the same footing with other contracts, and there must be some good reason for a resort to equity with respect to them, else the parties, both the insurer and insured, must remain satisfied with their legal remedies.

The true doctrine is stated by Mr. Phillips (2 Phil. Ins. p. 574, pl. 1933). He says: "Courts of law have the usual jurisdiction upon policies of insurance." After noticing the former course of the equity courts, he adds: "The limits of the jurisdiction in law and equity, in respect to policies, are now as well settled as in respect to any other species of contracts, the general jurisdiction being in the courts of law, with exceptions upon the same grounds as other contracts." It is proper to observe that he subsequently says: "A court of equity is the proper tribunal to which to apply to compel the assured to surrender a policy, fraudulently ob-

tained" (Id. pl. 1988); and Mr. Angell adopts his language (Ins. § 384).

The material cases referred to by these authors, together with other cases, will now be briefly noticed in the order of their occurrence.

In Whittingham v. Thornburgh (1690) 2 Vern. 206, 2 Eq. Cas. Abr. 635, a life policy was obtained by fraud. After the loss, the court ordered the policy to be delivered up to be cancelled, and a perpetual injunction against the verdict obtained thereon at law. This case is very briefly reported, occupying but a few lines. The grounds on which equity interfered, not only with the policy, but with the verdict at law, are not stated. No point appears to have been made upon the jurisdiction in equity. In the report in 2 Eq. Cas. Abr. supra, it is said the answer confessed the fraud. In Goddard v. Garret (1692) 1 Eq. Cas. Abr. 371, 2 Vern. 269, which was a bill to have a marine policy delivered up because the insured had no interest in the property covered by the policy, the court made a decree as prayed, although there appears no reason why the defence was not open to the insurer at law. No question is made or discussed as to the ground of equitable interference; and this was the case cited by counsel when Mansfield, C. J., made the observation above quoted from 3 Taunt. 517, as to the odd jurisdiction formerly exercised by equity over policies of insurance. In De Costa v. Scandret (1723) 2 P. Wms. 170, 2 Eq. Cas. Abr. 636, the assured fraudulently concealed from the underwriter information which he had that his ship was in danger. Without anything being said in the very brief report of the case about jurisdiction, Lord Macclesfield, on a bill for injunction (against what does not appear) and relief, decreed the policy to be delivered up, with costs. In French v. Connelly, 2 Anstr. 454, 1794, which was a bill by underwriters for an injunction to restrain a suit at law, and for discovery and relief from the policy, because obtained by fraud, the court overruled a general demurrer to the bill, and properly enough, for at all events the underwriters were entitled to a discovery to aid the defence at law. The next case which it is deemed necessary to notice, is that of Duncan v. Worrall (1822) 10 Price, 31. In this case a bill by the underwriters for an injunction against an action at law on the policy, and to have the same cancelled because of false and fraudulent representations as to the neutral character of the property insured, "was dismissed on the ground that it was founded on matters which, if true, afforded a defence to the action at law, and therefore, there was no equity on the part of the plaintiff to warrant the interference of the court of equity."

The Lord Chief Baron Richards alludes in strong language to his experience of over forty years, respecting bills to stay actions on policies, and to cancel them; said he had never known one to have been brought to a hearing, and observed "that Lord Chief Baron Eyre, who was always, we know, considered a strong-headed man, used to say that he considered bills for discovery and injunction by underwriters in these cases, as being filed, for the most part, merely with a fraudulent intention to create delay, and I never remember one to have been acted on further than the dissolving the injunction." Fenn v. Craig (1838) 3 Younge & C. Exch. 216, also occurred in the exchequer, in equity. It was a bill by a life insurance company to cancel a policy on the life of a third person, obtained by the defendant by fraudulent representations as to the habits of the assured. The bill was filed promptly the next year after the insurance was made, and before the death occurred. It was held on demurrer that the bill would lie, Alderson, Baron, observing that the equity was strengthened because suit was brought in the lifetime of the person who was insured. This was right, and is not in conflict with the views expressed in the foregoing opinion, but rather co-incident with them. Thornton v. Knight (1849) 16 Sim. 509, holds, that even after a verdict at law against a policy, equity will not entertain a bill to cancel it, unless some equitable ground be shown, such as fraud. In the India & London Life Assur. Co. v. Dalby (1851) 7 Eng. Law & Eq. 250, the vice chancellor, on a bill to restrain an action at law, overruled a demurrer to the bill on the ground that there was an equity stated against the action. It is not readily perceived what equity was stated not available as a defence to the law action; but if an equity was alleged, the case is consistent with correct principle, viz., that equity will not interfere except where the remedy at law is inadequate, difficult, or uncertain.

The foregoing are the leading adjudications on the subject under consideration in England, and it is quite a significant circumstance against the present bill that the American reports do not show that any similar bill has been filed.

The cases in the English books show that when bills are entertained, injunctions are refused or dissolved, thus leaving the real litigation to be had at law. If the verdict is for the policy, of course the bill is dismissed. If against it, then the bill may be brought to a hearing, and the court will, in proper cases, order the policy to be surrendered, an order which, after such a verdict, is quite unnecessary and useless. The English cases referred to are not, as before observed, very satisfactorily reasoned, and are not free from conflict. The old cases are entitled to very little respect as authority, and the modern ones tend to show that equity will not oust the law jurisdiction, or interfere with the legal remedies where there is a full defence at law, and no obstacle in the way of making it. Insur-

ance contracts should stand upon the same footing as other contracts with respect to equity interference, else we have an anomaly in the law without any reason to justify it. The result is, that the motion to dissolve the injunction is well taken, and must be sustained.

MILLER, Circuit Justice, concurring in the foregoing result, observed: I am entirely satisfied with the opinion prepared by the circuit judge, both with the result, and the course of argument by which that result is attained. I think the turning points of the case are, that the loss had occurred before the bill was filed, and that by reason of the limitation in the policy as to the time of bringing suit, and the allegation that the defendants were threatening to sue at law, there is no danger of indefinite delay, nor is there any other circumstance alleged warranting a resort to equity. In case such a bill were filed before loss, or if a life policy, before death, I am strongly inclined to believe it should be sustained. Injunction dissolved.

Afterwards the court sustained a general demurrer to the bill, and dismissed the same. The course of argument by Marshall, C. J., in Marine Ins. Co. v. Hodgson, 7 Cranch [11 U. S.] 332, seems to support the conclusion reached in the foregoing case.